IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| WALESKA GONZALEZ-SANTIAGO, *et al.*,<br><br>**Plaintiffs,**<br><br>**v.**<br><br>KARIMAR CONSTRUCTION, INC.,<br><br>**Defendant.** | **Civil No.** 15-1239 (FAB) |

MEMORANDUM AND ORDER

BESOSA, District Judge.

Waleska Gonzalez ("Gonzalez") and Maida Baez ("Baez") brought suit against Karimar Construction, Inc. ("Karimar") alleging that Karimar violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and Puerto Rico laws 69 and 100 when it declined to hire them to perform construction work to remodel the Hector I. Rivera School ("Rivera Project"). (Docket No. 1.) Before the Court is Karimar's motion for summary judgment regarding the Title VII claims. (Docket Nos. 27, 28.) Having considered it, plaintiffs' opposition, (Docket No. 33), and defendant's reply, (Docket No. 37), the Court **DENIES** defendant's motion for summary judgment because genuine issues of material fact exist and the case must proceed to trial.

I.   **Summary Judgment Standard**

Summary judgment serves to assess the evidence and determine if there is a genuine need for trial. <u>Garside v. Osco Drug, Inc.</u>,

895 F.2d 46, 50 (1st Cir. 1990).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "At summary judgment, the judge's function is not himself or herself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Burns v. Johnson, 829 F.3d 1, 8 (1st Cir. 2016) (internal marks omitted) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

A fact is "material" if it "has the potential to change the outcome of the suit under the governing law . . . ." Calero-Cerezo v. U.S. Dep't. of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  A dispute is "genuine" when it "could be resolved in favor of either party." Id.  "Put another way, a 'genuine' issue exists if there is 'sufficient evidence supporting the claimed factual dispute' to require a choice between 'the parties' differing versions of the truth at trial." Garside, 895 F.2d at 48 (quoting Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975)).  "Issues are not suitable for summary judgment if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" Martinez-Burgos v. Guayama Corp., 656 F.3d 7, 11 (2011) (quoting Liberty Lobby, 477 U.S. at 248).

The party moving for summary judgment has the initial burden of "demonstrat[ing] the absence of a genuine issue of material

fact" with definite and competent evidence.  Campos v. Van Ness, 711 F.3d 243, 247-48 (1st Cir. 2013) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  It must identify sections of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" which support its motion.  Id.  Once a properly supported motion has been presented, the burden shifts to the nonmoving party "to demonstrate that a trier of fact reasonably could find in its favor." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (internal marks and citation omitted).

"The mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Murray v. Kindred Nursing Ctrs. W. LLC, 789 F.3d 20, 25 (1st Cir. 2015) (quoting Liberty Lobby, 477 U.S. at 252).  A party opposing summary judgment is required to "present definite, competent evidence to rebut the motion." Martinez-Rodriguez v. Guevara, 597 F.3d 414, 419 (1st Cir. 2010) (quoting Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008)).  In making this assessment, the court must "review the record in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor." Escribano-Reyes v. Prof'l Hepa Certificate Corp., 817 F.3d 380, 386 (1st Cir. 2016).

## II.  Facts

### A.   Karimar and Its Projects

Karimar is the general contractor who was in charge of
the Rivera Project, a "design and build" construction project which
lasted from March 10, 2014 to November 2014.  (Docket Nos. 29-1;
29-2 at pp. 49-50, 77, 80.)  Karimar started the project with four
workers – a mason, a carpenter, a welder, and a heavy machinery
operator – and throughout the duration of the project hired forty-
two employees to work as masons, laborers, carpenters, plumbers,
digger operators, drivers, safety operators, and supervisors.
(Docket No. 29-2 at pp. 78-79, 84-85, 186.)  Prior to and during
the duration of the Rivera Project, several lists of applicants for
the project were created.  Id. at pp. 141-46 (list created by the
school's secretary), 154 (lists created by Felipe Barreto-Bosques;
29-6 at p. 19 (list created by applicants waiting outside the
project.)

### B.   Karimar's Hiring Practices

Karimar employs several "in house" employees that it
moves between projects.  (Docket No. 29-1.)  It often uses "in-
house" employees from previous projects on new projects.  (Docket
No. 29-2 at p. 69.)  If needed for particular projects, Karimar
hires additional workers at the project site.  Id.  Karimar's "in
house" employees have priority over on-site hires because Karimar
superintendents hiring for projects are required to hire available

Civil No. 15-1239 (FAB)                                                      5

"in house" employees before hiring on-site employees.  (Docket
No. 29-2 at 67-68.)  Twenty-seven "in house" employees performed
work on the Rivera Project.  (Docket No. 29-1.)

          Felipe Barreto-Bosques ("Barreto"), a construction worker
who studied engineering, has worked for Karimar as a project
supervisor or superintendent since September 2007.  (Docket No. 29-
2 at pp. 9, 19-20.)  His duties include preparing budgets,
conducting inventories, interpreting blueprints and drawings,
assigning tasks to employees, and hiring employees.  Id. at pp. 21-
23.

          Barreto received verbal recommendations and company
policy guidance regarding the hiring of employees, including
instruction to cease hiring employees after a project's employment
needs are met.  (Docket No. 29-2 at pp. 61-62.)  Barreto also
received instructions and directives via posters and monthly safety
inspector visits regarding sex discrimination, sexual harassment,
and the illegality of employment discrimination based on sex, race,
color, and religion.  Id. at 75.  Barreto, as superintendent of a
project, had some discretion regarding the decision to hire
employees, but did not always have "the last word."  Id. at p. 63.

     **C.   Plaintiffs**

          Gonzalez and Baez met in 2012 while working for Cesar
Diaz Construction Company on the Rafael Aparicio Jimenez School
project ("Jimenez Project") and have since become friends.  (Docket

Nos. 29-3 at pp. 7, 10-11; 29-4 at p. 49.)   The Jimenez Project was Gonzalez' first employment as a construction laborer.  (Docket No. 29-3 at 10.)   Baez, on the other hand, has twenty years of experience in construction.  (Docket No. 29-4 at p. 46.)

        Gonzalez's cousin, Reinaldo Santiago-Gonzalez ("Santiago-Gonzalez"), alerted her to the existence of the Rivera Project and encouraged her to apply.   (Docket No. 29-3 at p. 18.) Subsequently, both Gonzalez, on March 13, 2014, and Baez, on April 10, 2014, went to the Rivera Project site and spoke with Barreto in an attempt to procure employment.  (Docket Nos. 29-2 at pp. 89-90, 161; 29-3 at pp. 15-16; 29-4 at p. 34.)   The parties disagree on some details of these encounters.

        **D.   The Gonzalez Meeting**

        Gonzalez drove her car into the Rivera Project site and was met by Barreto as she exited it.  (Docket Nos. 29-2 at p. 89; 29-3 at pp. 20-21.)[1]  According to Gonzalez, Barreto told her that "he wasn't[*sic*] not hiring women, because women [were only hired] for cleaning dut[ies]" and there was no cleaning required at that time.  (Docket No. 29-3 at p. 22.)  Gonzalez informed Barreto that, although she was willing to perform cleaning duties, she was seeking employment in construction because she was a laborer.  Id. Barreto informed her that he would be bringing Karimar employees

_____

[1] The parties debate whether driving into the project site violated safety rules, but fail to establish the relevance of a violation to plaintiffs' claims.  See Docket Nos. 29 at pp. 4-5; 32 at pp. 3-5.)

from other sites to staff the Rivera Project and thereafter he would hire workers from those waiting at the gate, but would not skip over "all the men" to hire her. (Docket No. 29-3 at pp. 27, 32, 39, 41.)

According to Gonzalez, Barreto did not tell her that there were no vacant positions. (Docket No. 29-3 at p. 24.) Nor did he instruct her to wait outside of the project for employment opportunities or to provide her contact information on an applicant list. Id. at 27-28. Gonzalez did not see anyone waiting outside of the Rivera Project on March 13, 2014. Id. at p. 32.

According to Barreto, when Gonzalez informed him that she was seeking employment on the Rivera Project, he told her that Karimar was fully staffed for the current stage of the project and had no vacancies at that time. (Docket No. 29-2 at pp. 95-96.) Barreto told Gonzalez that she could wait with the 10-15 other applicants who were also seeking employment on the project and who had been coming to the project each morning since the project's beginning seeking employment. Id. at pp. 99-100, 103. Barreto told her that the applicants waiting outside the Rivera Project would be given priority to work at the project. Id. at 99-100. At no point did Barreto tell Gonzalez that women were only used for cleaning duties after construction projects because Barretto knows that that statement would be sex discrimination because women are

entitled to the same laborer and mason jobs as men.  (Docket No. 29-2 at pp. 98-99.)

Barreto and Gonzalez spoke for approximately four or five minutes regarding the Rivera Project.  (Docket No. 29-2 at p. 99.) Barreto also signed an unemployment document for Gonzalez.  Id. at pp. 116-117; Docket No. 29-3 at p. 25.

### E.    The Baez Meeting

According to Barreto, upon arriving at the Rivera Project, Baez first spoke with Hector Irizarry ("Irizarry"), the project's safety inspector.  (Docket No. 29-2 at pp. 161-162.) Irizarry escorted Baez into Barreto's office and informed Barreto of Baez's desire to speak with him.  Id. at pp. 162, 164.  When Baez informed Barreto that she was seeking employment on the Rivera Project, Barreto told her that Karimar was not recruiting personnel at that time.  Id. at pp. 162-63.  Barreto told her that she could wait "with everybody else who was outside" of the project and that the applicants waiting outside of the project would have priority if positions became available.  Id. at p. 163.  Baez asked Barreto if there were any women working on the Rivera Project, and Barreto indicated that there were none.  Id. at pp. 170-171.  He did not, however, tell Baez the he did not have to hire women.  Id. at p. 170.  The two spoke for approximately four or five minutes regarding the Rivera Project.  Id. at p. 175.  Barreto also told Baez that she could give her information to Irizarry and then

Irizarry escorted Baez to the Rivera Project's gate.  Id. at pp. 164, 177.

        According to Baez, when she arrived at the Rivera Project at 7:00 a.m. on April 20, 2014, she waited at the project entrance. (Docket No. 29-4 at pp. 34-35.)  Another applicant who was also waiting outside of the project instructed her to go into the project to speak with the engineer because Baez would "have more probabilities because [she is] a woman" and may have been able to obtain employment.  Id. at 35.  Upon entering the project and Barreto's office, Baez informed Barreto that she was seeking employment.  Id. at p. 39.  Barreto replied "there wasn't work in construction," because "women weren't necessary in a construction project."  Id. at pp. 39-40.  Barreto also said that at that time he did not have a reason to hire her.  Id. at p. 47.  Baez asked Barreto if there were any women working on the Rivera Project, and Barreto indicated that there were not.  (Docket Nos. 29 at p. 13; 32 at p. 13.)  Baez did not leave her contact information with Barreto because she was not aware of the existence of a potential employee list.  (Docket No. 29-4 at p. 40.)  Nor did Baez wait outside the Rivera Project because Barreto never instructed her to do so.  Id. at p. 41.  Baez recounts that on April 10, 2014, there were no women waiting outside of the Rivera Project.  Id.  She does, however, recall that women from Juana Diaz had previously been waiting there.  Id. at p. 42.

   **F.   Other Applicants and Hired Employees**

        Throughout the duration of the Rivera Project, employees
were hired from previous projects, from applicants waiting outside
of the project whose names appeared on applicant lists, and from
other sources.

        Santiago-Gonzalez, who had been hired by Karimar to work
on the Rivera Project as a welder, (Docket No. 29-6 at pp. 9, 13-
14), recalls that several people from a previous project, the
Jimenez Project, sought employment by waiting in front of the
Rivera Project.  (Docket No. 29-6 at pp. 15-16.)  He stated that
after showing up early in the morning and waiting for several days,
some of the people at the gate were hired to work on the Rivera
Project.  Id. at p. 16.

        Applicant Jordan-Irizarry, who unsuccessfully sought work
on the Rivera Project in April 2014, recounts that he saw several
people   outside   of   the   project   awaiting   employment
opportunities.  (Docket No. 29-5 at pp. 18, 24-25.)  He testified
that between eight and ten people waited there each day.  Id. at
p. 24.

        From the lists compiled by several sources, including
applicants waiting outside the Rivera Project, Barreto hired six or
seven employees.  (Docket No. 29-2 at pp. 158-160.)  Two women
appear on the applicant lists, Gloria Nuñez-Badea and Franchesca
Hernandez-Aponte, but Baretto did not hire either of them.  (Docket

Civil No. 15-1239 (FAB)                                              11

No. 29-2 at pp. 156-57.)  Neither Baez or Gonzalez appear on the applicant lists.  Id.

Other applicants hired did not appear on the lists. (Docket No. 29-2 at p. 160.)  Twelve men, listed below, were hired to work on the Rivera Project between March and September 2014. (Docket No. 29-2 at pp. 127-28, 134-39.)

| Name | Date Hired (2014) | Position |
|---|---|---|
| Jose Sanchez-Rivera | September 9 | Driver |
| Adalberto Flores-Maldonado | April 14 | Cement Mason |
| Alfredo Rosado-Garcia | October 2 | Laborer |
| Derlin Cordero-Galloza | March 19 | Laborer |
| Efrain Rivera-Hernandez | May 12 | Carpenter |
| Hector Bonilla-Bonilla | August 7 | Laborer |
| Jose Vazquez-Cancela | April 18 | Laborer |
| Natalio Bermudez-Roman | September 11 | Laborer |
| Paul Trinidad-Santana | March 27 | Laborer |
| Ruben Hernandez-Andujar | April 8 | Laborer |
| Xavier Caraballo-Mendez | March 25 | Laborer |
| Edwin Rosa-Ramos | April 13 | Laborer |

According to Karimar Administrator Hector Arcelay-Acevedo, no employee, male or female, was hired on March 13 or April 10, 2014 (Docket No. 29-1), the dates when Gonzalez and Baez requested employment.

### G.   Antidiscrimination Unit Complaints

Following their attempts to obtain employment at the Rivera Project, both Gonzalez and Baez filed complaints with the Antidiscrimination Unit ("AU") on April 10, 2014.  (Docket No. 29-3 at p. 29.)

In her complaint to the AU, Gonzalez stated that:

> Mr. Barreto told me that he could not employ me, because they were not on cleaning duty, and the project was beginning.  I told him that I was not a cleaning lady, that [*sic*], but that in fact if I had to clean, I would do so.  But that I was a working woman, a construction working woman.  And he told me that he was very sorry, but that he was not going to skip me ahead of anybody, because he had people that would stand every morning at the gate, and that he also had more than 100 applications and resumes on his desk.

(Docket No. 29-3 at pp. 30-31.)

Similarly, Baez stated in her AU complaint that when she sought employment at the Rivera Project, Barreto "told [her] that women aren't necessary, since he had other employees, men, from another project that worked first."  (Docket No. 29-4 at pp. 45-46.)  The AU complaint also states that she raised the issue of lack of female employees on the project to Baretto and he replied that he "didn't like that attitude because he knew what was going on . . . ."  Id. at p. 46.

## III. Discussion

Title VII prohibits covered employers from "refus[ing] to hire . . . any individual . . . because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C.

§ 2000e-2(a)(1).   "The core inquiry in a gender-based disparate treatment[2] case is whether the defendant intentionally discriminated against the plaintiff because of her gender."  Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010) (citing Rathbun v. Autozone, Inc., 361 F.3d 62, 71 (1st Cir. 2004)).

"A plaintiff may demonstrate a sex discrimination claim with circumstantial evidence through the burden-shifting scheme set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) . . . ."  Burns, 829 F.3d at 8.  First, the applicant must establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  "Satisfaction of the prima facie burden creates a rebuttable presumption that discrimination prompted the challenged adverse employment action."  Martinez-Burgos, 656 F.3d at 12 (citing Cumpiano v. Banco Santander P.R., 902 F.2d 148, 153 (1st Cir. 1990)).  If the plaintiff establishes a prima facie case, the burden shifts to the employer to produce a legitimate nondiscriminatory reason ["LNDR"] for its employment

---

[2] Plaintiffs allege individual disparate treatment, discriminatory failure to hire plaintiffs, and systemic disparate treatment, that Karimar has intentionally engaged in discriminatory "policies and practices." (Docket No. 1 at p. 6.)  Both parties, however, frame their arguments using the McDonnell Douglas framework that applies solely to individual disparate treatment claims.  See Diaz v. Ashcroft, 301 F. Supp. 2d 112, 115 (D.P.R. 2004) (Gelpi, J.).  The Court still considers evidence of Karimar's practices because "courts have held that evidence of general patterns of discrimination treatment by an employer may be relevant even in an individual disparate treatment . . . case because such evidence may help prove discriminatory animus."  Sanchez-Medina v. UNICCO Serv. Co., 265 F.R.D. 29, 40 (D.P.R. 2010) (Arena, C. Mag.).

decision.  Id.; see also Jones v. Walgreen Co., 679 F.3d 9, 20 (1st

Cir. 2012).  Finally, the applicant may rebut the employer's LNDR

as pretext or establish that the employer's true motive for the

adverse employment action was discriminatory.  McDonnell Douglas,

411 U.S. at 803.  "At all times, the plaintiff bears the ultimate

burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff."  Gu v. Boston

Police Dep't, 312 F.3d 6, 11 (1st Cir. 2002) (internal citations

and quotations removed); see also Dichner v. Liberty Travel, 141

F.3d 24, 30 (1st Cir. 1998).

### A.   *Prima Facie* Case of Discrimination

A *prima facie* case of discrimination pursuant to

Title VII requires a plaintiff to show that:  "(1) she is a member

of a protected class, (2) she applied and was qualified for [a

vacant] position, and (3) the [potential employer] rejected her and

(4) hired someone with similar or lesser qualifications."

Moron-Barradas v. Dep't of Educ. of Com. of P.R., 488 F.3d 472, 478

(1st Cir. 2007) (citing McDonnell Douglas, 411 U.S. at 802); see

also Clifford v. Barnhart, 449 F.3d 276, 281 (1st Cir. 2006).

"Meeting the initial *prima facie* requirement is 'not especially

burdensome.'"  Martinez-Burgos, 656 F.3d at 12 (quoting Greenberg

v. Union Camp Corp., 48 F.3d 22, 26 (1st Cir. 1995)).

The parties agree that both Gonzales and Baez were members of a protected class[3] who applied for and were rejected from employment that was later awarded to other applicants. (Docket No. 28 at p. 6.)  Plaintiffs have posited, and defendant has not challenged, that Gonzalez and Baez were qualified to work as laborers on a school renovation project because they had performed similar work in the past. See Docket No. 29-3 at pp. 10-11; see also Garayalde-Rijos v. Mun. of Carolina, 747 F.3d 15, 23-24 (1st Cir. 2014) (considering experience in the designated field in determining whether employee was qualified for the vacant position).  Nor does defendant challenge that the workers hired on the Rivera Project had similar or lesser qualifications than Gonzalez, an experienced laborer, or Baez, a twenty-year veteran laborer, (Docket No. 29-3 at p. 10; 29-4 at p. 46).  The parties, however, disagree regarding the existence of vacant positions.

In considering whether a vacant position exists, the First Circuit Court of Appeals has stated that "[a]n employer is not required . . . to create a new job for an employee, nor to re-establish a position that no longer exists."[4] Phelps v. Optima Health, Inc., 251 F.3d 21, 27 (1st Cir. 2001); see also Beams v.

---

[3] Women are members of a Title VII protected class. Dragon v. Dep't. of Mental Health, Retardation & Hosp., 936 F.2d 32, 35 (1st Cir. 1991).

[4] Congress intended that Title VII and the Americans with Disabilities Act Title I be treated uniformly. Roman-Oliveras v. P.R. Elec. Power Auth., 655 F.3d 43, 52 (1st Cir. 2011).

Norton, 256 F. Supp. 2d 1203, 1214 (D. Kan. 2003), aff'd, 93 F.
App'x 211 (10th Cir. 2004) (quoting Baltazor v. Holmes, 162 F.3d
368, 374 (5th Cir. 1998) ("No employer can discriminate for failing
to fill a position which no longer exists unless the employer
eliminated the position as a means of discrimination.")).  Rather,
the applicant "bears the burden of proof in showing that such a
vacant position exists."  Lang v. Wal-Mart Stores E., L.P., 813
F.3d 447, 456 (1st Cir. 2016).  In determining the existence of a
vacant position, courts may consider whether the employer continued
to seek applicants after they rejected the plaintiff-applicant.
Smith v. Janey, 664 F. Supp. 2d 1, 12 (D.D.C. 2009), aff'd sub nom.
Smith v. Rhee, No. 09-7100, 2010 WL 1633177 (D.C. Cir. Apr. 6,
2010); see also United States v. City of N.Y., 631 F. Supp. 2d 419,
429 (S.D.N.Y. 2009) ("When a position is not filled and a defendant
continues to seek similarly-qualified applicants, a reasonable
inference of discrimination may be drawn.").

        Defendant contends that on the days that plaintiffs
sought employment, March 13 and April 10, 2014, defendant did not
have any open or vacant position.  (Docket No. 28 at p. 6.)  It
supports this claim by reference to the alleged fact that no
employee, male or female, was hired on either of those dates,
(Docket No. 29-1), and the alleged fact that Barreto told both
Gonzalez and Baez that there were no vacant positions at the times
of their inquiries, (Docket No. 29-2 at pp. 99, 162-63).

Plaintiffs counter that there were positions available, and while no employees were hired on the particular days of their inquires, several male employees were hired within days of their requests for employment.[5]  (Docket No. 33 at p. 10.)  Gonzalez requested employment as a laborer on March 13, 2014, (Docket No. 29-3 at pp. 23, 25), and Karimar hired four male laborers within two weeks of Gonzalez's employment inquiry, (Docket No. 29-2 at pp. 136-39 (March 19, 25, and 27).  Similarly, Baez requested employment on April 10, 2014, (Docket No. 29-4 at p. 39), and Karimar hired male laborers on April 8, 13, and 18 and a male cement mason on April 14, (Docket No. 29-2 at pp. 134, 137-39).

This issue of the existence of a vacant position presents a genuine dispute because a reasonable jury could find in favor of either party and it is a material fact because the absence or presence of this element of the *prima facie* case could be determinative.  Accordingly, this issue of the existence of open or vacant employment positions must proceed to trial.

## B.   Legitimate Nondiscriminatory Reasons

If plaintiffs are able to establish a *prima facie* case of discrimination, defendant claims it is still not in violation of

---

[5] Defendant draws attention to the fact that neither Gonzalez nor Baez submitted a formal resume or application. (Docket No. 28 at pp. 8, 10.)  The court in Velez v. Janssen Ortho, LLC, however, found an exception to the general requirement to apply formally to a position when an employer does not regularly advertise vacant positions.  467 F.3d 802, 808 n.6 (1st Cir. 2006).

Title VII because it had two LNDRs for declining to hire plaintiffs. (Docket No. 28 at pp. 10-11.) First, defendant realleges that there were no vacant positions at the time that plaintiffs sought employment. Id at p. 11. The Court has already discussed that there is a genuine dispute of material fact regarding this issue requiring that it go forward to the jury.

Next, defendant contends that they hired employees for the Rivera Project based on an established order of preference: first, employees who were already on Karimar's payroll due to work performed on previous projects; and second, employees whose names appeared on one of several lists or who repeatedly sought employment by waiting outside of the project site. (Docket No. 28 at p. 11.)

Just as an employer is not required to violate the rights of other employees when reassigning workers, see Feliciano v. Rhode Island, 160 F.3d 780, 787 (1st Cir. 1998), neither is an employer required to violate the rights of other applicants in making hiring decisions. Also, a policy of hiring internal applicants only is a valid reason to reject an external applicant. Morgan v. Fed. Home Loan Mortg. Corp., 328 F.3d 647, 652 (D.C. Cir. 2003).

Although plaintiff Gonzalez asserts that no applicants were waiting outside the project when she sought employment on March 13, 2014, (Docket No. 29-3 at p. 32), both plaintiff Baez and witness Santiago-Irizarry attest that there were applicants waiting

for employment throughout the duration of the Rivera Project. (Docket Nos. 29-4 at pp. 35, 41-42; 29-5 at pp. 24-25 (between eight and ten people daily).)  Plaintiffs admit that Karimar gives priority in hiring to "in house" employees.  (Docket Nos. 29-2 at pp. 67-68; 29 at p. 4; 32 at p. 3.)[6]  Additionally, plaintiffs admit that Barretto hired six or seven people from applicants seeking employment at the Rivera Project whose names appeared on one of several applicant lists.[7]  (Docket Nos. 29-2 at p. 158; 29 at p. 7; 32 at p. 9.)

Because the burden to assert a LNDR is one of production, Martinez-Burgos, 656 F.3d at 12, the Court accepts defendant's asserted LNDR that it hired based on an established order of preference.

**C.   Pretext or Discriminatory Motive**

Because defendant has met its burden of producing a LNDR, the burden shifts back to plaintiffs to establish that defendant's LNDR is pretext or that discrimination was the true motivator of Karimar's decision not to hire them.  See McDonnell Douglas, 411 U.S. at 803.  "[B]ecause courts do not serve as super-personnel

---

[6] The Court finds that defendant's statement is supported by the cited deposition testimony and therefore plaintiffs' denial is unsupported and the fact is admitted.  See Local Rule 56 (c),(e).

[7] It is contested whether the applicants waiting outside of the Rivera Project made their own applicant list.  (Docket Nos. 29-2 at p. 160; 32 at p. 10.)

departments that reexamine an entity's business decisions, a
plaintiff asserting that an employers explanation is pretextual
. . . faces a formidable task." Janey, 664 F. Supp. 2d at 12
(citing Pearsall v. Holder, 610 F. Supp. 2d 87, 100 (D.D.C.2009)).

     A plaintiff may establish pretext by highlighting
"weaknesses, implausibilities, inconsistencies, incoherencies, or
contradictions in the employer's proffered legitimate reasons such
that a factfinder could infer that the employer did not act for the
asserted non-discriminatory reasons." Pina v. Children's Place,
740 F.3d 785, 797 (1st Cir. 2014) (quoting Straughn v. Delta Air
Lines, Inc., 250 F.3d 23, 42 (1st Cir. 2001)). This evidence may
be used to establish discriminatory motive or that the LNDR is
pretext "provided that the evidence is adequate to enable a
rational factfinder reasonably to infer that unlawful
discrimination was a determinative factor in the adverse employment
action." Id. (quoting Santiago-Ramos, 217 F.3d at 54).

     Here, plaintiffs claim that Barreto's statements – that
"women weren't necessary in a construction project," that women are
only used for cleaning on construction projects, and that he would
not bypass "all the men" in order to hire Gonzalez – indicate that
his motive for not hiring them was discriminatory based on their
gender. (Docket Nos. 1 at p. 6; 29-3 at pp. 22-23, 39; 29-4 at
pp. 39-40; 33 at pp. 2, 10.) Defendant denies that Barreto ever
made these statements. (Docket No. 29-2 at pp. 98-99, 170.)

Plaintiffs also highlight the fact that no female workers were hired for the Rivera Project.  (Docket No. 29-4 at p. 46.)

These issues - whether defendant made statements and whether the statements establish that sex discrimination is the real reason that plaintiffs were not hired – present genuine disputes because a reasonable jury could find in favor of either party.  They are material facts because the absence or presence of this discriminatory motive could be determinative.  Accordingly, these issues must proceed to trial.

**VI.  Conclusion**

Because genuine disputes of material fact exist regarding plaintiffs' Title VII discrimination claim, defendant's motion for summary judgment, (Docket Nos. 27, 28), is **DENIED.**

At trial, the jury will be faced with deciding first, whether plaintiffs have established a *prima facie* case by proving that a vacant position existed.  If the jury decides that a vacant position did exist, satisfying the first step of the McDonnell Douglas framework, the defendant's LNDR - that it hired according to an established order of preference – will satisfy the second prong.  Thus, the jury will then decide whether Barreto made the alleged statements and whether those statements show that he had a discriminatory motive, sex, for not hiring Gonzalez and Baez.

Plaintiffs' Puerto Rico law 100 and 69 claims will also proceed to trial.

Civil No. 15-1239 (FAB)                                                    22

**IT IS SO ORDERED.**

San Juan, Puerto Rico, November 29, 2016.


                                        s/ Francisco A. Besosa
                                        FRANCISCO A. BESOSA
                                        United States District Judge